**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

THOMAS LEE MILLER,

      Petitioner,

vs.

UNITED STATES OF AMERICA,

      Respondent.

No. C06-3081-MWB
(No. CR03-3034-MWB)

**MEMORANDUM OPINION AND
ORDER REGARDING
PETITIONER'S § 2255 MOTION**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. The Petitioner's § 2255 Motion* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. The Petitioner's Charges, Trial, Sentence, and Appeals* . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   *A. Standards for Relief Pursuant to § 2255* . . . . . . . . . . . . . . . . . . . 4
   *B. Ineffective Assistance of Counsel Claims* . . . . . . . . . . . . . . . . . . 6
      *1.   Ineffective assistance of counsel standards* . . . . . . . . . . . . . . 6
      *2.   Failure to investigate* . . . . . . . . . . . . . . . . . . . . . . . . . 9
      *3.   Failure to interview witnesses* . . . . . . . . . . . . . . . . . . . . 12
         *a.   Dennis Hinrichs* . . . . . . . . . . . . . . . . . . . . . . . 12
         *b.   Tammy Meyeraan and Leigh Johnson* . . . . . . . . . . . 13
      *4.   Failure to challenge post arrest statements* . . . . . . . . . . . . . 18
   *C. Motion for Evidentiary Hearing* . . . . . . . . . . . . . . . . . . . . . . . 20

*III. CERTIFICATE OF APPEALABILITY* . . . . . . . . . . . . . . . . . . . . . . . . . 21

*IV. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I. INTRODUCTION AND BACKGROUND

### A. The Petitioner's § 2255 Motion[1]

On November 22, 2006, petitioner Thomas Lee Miller filed his Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 ("Motion") and accompanying documents[2] (docket no. 1). Miller supplemented his Motion on July 11, 2007, with his Declaration of Thomas Lee Miller (docket no. 5). In his Motion and declaration, Miller claims, first, that his Sixth Amendment right to effective assistance of counsel was violated, because his trial counsel failed to conduct an adequate pretrial investigation. Second, Miller claims that his trial counsel was ineffective for failing to challenge statements Miller made subsequent to his May 30, 2001 arrest. On July 23, 2007, the government filed its Court Ordered Response to Defendant's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (docket no. 6-1), which included an affidavit from Miller's trial counsel (docket no. 6-2). In its response, the government first claims that an evidentiary hearing is unnecessary in this case. Additionally, and in response to Miller's claims, the government argues that there is no evidence that trial counsel acted negligently during his pre-trial investigation as he properly communicated with Miller and Miller's mother, and interviewed several witnesses. Concerning trial counsel's failure to challenge post arrest statements, the government contends that he consulted Miller about whether to pursue suppression of the statements and that they decided not to pursue suppression. Miller filed his Reply to Government's Response on September 13, 2007 (docket no. 9). In the reply, Miller claims that the case presents "the classic 'battle of the affidavits'" and that this court

---

[1] Miller's § 2255 motion is case number C06-3081-MWB, and the docket entries cited under this section are associated with this civil case number.

[2] Along with his Motion, Miller filed a Declaration of Sandra Kilen and Attached Documents; Declaration of Tammy Meyeraan; and Declaration of Leigh Johnson.

should hold an evidentiary hearing to assess the credibility of the parties' conflicting testimony.

Filed concurrently with his reply on September 13, 2007, Miller submitted his Motion for Evidentiary Hearing (docket no. 10-1) and Brief in Support of Motion for Evidentiary Hearing (docket no. 10-2). Miller seeks an evidentiary hearing because, and as stated above, he believes the court cannot adequately assess the claims of ineffective assistance of counsel without receiving testimony from Miller, his trial counsel, and the witnesses identified in Miller's declaration.

## B. The Petitioner's Charges, Trial, Sentence, and Appeals[3]

On April 16, 2003, a single count indictment was returned against Miller, charging him with manufacturing or attempting to manufacture 5 grams or more of pure methamphetamine within 1000 feet of a school, in violation of 21 U.S.C. §§ 846 and 860(a) (docket no. 1). Miller went to trial on the charge, and the trial lasted from September 22, 2003, to September 23, 2003. On September 23, 2003, the jury returned a verdict of guilty to the count as charged.

On September 30, 2003, Miller filed a motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c), and a motion for a new trial, pursuant to Federal Rule of Criminal Procedure 33, which this court denied (docket no. 56). On December 18, 2003, the undersigned sentenced Miller to 360 months imprisonment and 16 years of supervised release (docket nos. 57 and 58). Miller appealed his verdict and sentence to the Eighth Circuit Court of Appeals, which affirmed the verdict and sentence

---

[3] Miller's criminal case number is CR03-3034-MWB, and docket entries cited under this section are associated with this criminal case number.

on July 6, 2005 (docket no. 73). *See U.S. v. Miller*, 138 Fed.Appx. 857 (8th Cir. 2005). On August 22, 2005, the Eighth Circuit Court of Appeals also denied Miller's petition for rehearing *en banc* and his petition for rehearing by the panel (docket no. 70).

## II. LEGAL ANALYSIS

### A. Standards for Relief Pursuant to § 2255

Turning to the legal analysis of Miller's claims, in light of the evidence in the record, the court notes, first, that 28 U.S.C. § 2255 provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground [1] that the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a); *see also Watson v. United States,* 493 F.3d 960, 963 (8th Cir. 2007) ("Under 28 U.S.C. § 2255 a defendant in federal custody may seek post conviction relief on the ground that his sentence was imposed in the absence of jurisdiction or in violation of the Constitution or laws of the United States, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."); *Bear Stops v. United States*, 339 F.3d 777, 781 (8th Cir. 2003) ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). Thus, a motion pursuant to § 2255 "is 'intended to afford federal prisoners a remedy identical in scope to federal habeas corpus.'" *United States v. Wilson*, 997 F.2d 429, 431 (8th Cir.

1993) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)); *accord Auman v. United States*, 67 F.3d 157, 161 (8th Cir. 1995) (quoting *Wilson*).  On the other hand:

> Section 2255 relief is not available to correct errors which could have been raised at trial or on direct appeal, absent a showing of cause and prejudice, *United States v. Frady*, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 1594-95, 71 L. Ed. 2d 816 (1982), or a showing that the alleged errors were fundamental defects resulting in a complete miscarriage of justice. *See United States v. Smith*, 843 F.2d 1148, 1149 (8th Cir. 1988) (*per curiam*).

*Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (*per curiam*); *accord Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002) ("In order to obtain collateral review of a procedurally defaulted issue, [a § 2255 movant] must show 'either cause and actual prejudice, or that he is actually innocent.'") (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted).

The "cause and prejudice" that must be shown to resuscitate a procedurally defaulted claim may include "ineffective assistance of counsel." *See Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005).  Otherwise, "[t]he Supreme Court recognized in *Bousley* that 'a claim that "is so novel that its legal basis is not reasonably available to counsel" *may* constitute cause for a procedural default.'" *United States v. Moss*, 252 F.3d 993, 1001 (8th Cir. 2001) (quoting *Bousley*, 523 U.S. at 622, with emphasis added, in turn quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)).  "Actual prejudice" requires a showing that the alleged error "'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Johnson*, 278 F.3d at 844 (quoting *Frady*, 456 U.S. at 170, and explaining, further, that the movant must show that there is a substantial likelihood that, absent the error, a jury would have acquitted him of the charged offense).  To establish "actual innocence," as an alternative way to resuscitate a

procedurally defaulted claim, "'petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Id.* (quoting *Bousley*, 523 U.S. at 623). "'This is a strict standard; generally, a petitioner cannot show actual innocence where the evidence is sufficient to support a [conviction on the charged offense].'" *Id.* (quoting *McNeal v. United States*, 249 F.3d 747, 749-50 (8th Cir. 2001)).

The Eighth Circuit Court of Appeals will review the district court's decision on a § 2255 motion *de novo*, regardless of whether the district court's decision grants or denies the requested relief. *Compare United States v. Hilliard*, 392 F.3d 981, 986 (8th Cir. 2004) ("We review the district court's decision to grant or deny relief on a petitioner's ineffective assistance of counsel claim *de novo*.") (citing *United States v. White*, 341 F.3d 673, 677 (8th Cir. 2003)); *with United States v. Hernandez*, 436 F.3d 851, 854 (8th Cir. 2006) ("'We review *de novo* the district court's denial of a section 2255 motion.'") (quoting *Never Misses A Shot v. United States*, 413 F.3d 781, 783 (8th Cir. 2005)). However, "[a]ny underlying fact-findings are reviewed for clear error.'" *Hernandez*, 436 F.3d at 855 (quoting *United States v. Davis*, 406 F.3d 505, 508 (8th Cir. 2005)).

With these standards in mind, the court will evaluate Miller's claims for § 2255 relief.

## B. Ineffective Assistance of Counsel Claims

### 1. Ineffective assistance of counsel standards

Miller asserts that his trial counsel provided him with ineffective assistance of counsel in the following ways: by failing to conduct a proper investigation; by failing to interview potential defense witnesses; and by failing to challenge the admissibility of post arrest statements.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. AMEND. VI. This right has been interpreted to constitutionally entitle a criminal defendant to the effective assistance of counsel both at trial and on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003); *see also Steele v United States,* 518 F.3d 986, 988 (8th Cir. 2008). Thus, ineffective assistance of counsel at trial and on direct appeal could result in the imposition of a sentence in violation of the Constitution or laws of the United States and be grounds for relief under § 2255. *See Bear Stops*, 339 F.3d at 781 ("To prevail on a § 2255 motion, the petitioner must demonstrate a violation of the Constitution or the laws of the United States."). The Eighth Circuit Court of Appeals has expressly recognized that a claim of ineffective assistance of counsel should be raised in a § 2255 proceeding, rather than on direct appeal, because it often involves facts outside of the original record. *See United States v. Hughes*, 330 F.3d 1068, 1069 (8th Cir. 2003) ("When claims of ineffective assistance of trial counsel are asserted on direct appeal, we ordinarily defer them to 28 U.S.C. § 2255 proceedings."). Therefore, whether or not Miller is entitled to relief on his § 2255 motion turns on whether or not he can satisfy the standards applicable to his ineffective assistance of counsel claims.

As the Eighth Circuit Court of Appeals has explained, "'[t]he applicable law here is well-established: post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense.'" *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 836 (8th Cir. 2005) (quoting *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001), in turn citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Davis v. Norris*, 423 F.3d 868, 877

(8th Cir. 2005) ("To prove that his counsel rendered ineffective assistance in violation of the Sixth Amendment, [the movant] must satisfy the two prong test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)," which requires the movant to "show that his counsel's performance was deficient" and that he was "prejudice[d]").

The "deficient performance" prong requires the movant to "show that his 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 687). That showing can be made by demonstrating that counsel's performance "'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Strickland*, 466 U.S. at 688). There are two substantial impediments to making such a showing, however. First, "'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 690). Second, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689); *Davis*, 423 F.3d at 877 ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance."). If the movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003).

Even if counsel's performance was "deficient," the movant must also establish "prejudice" to overcome the presumption of reasonable professional assistance. *Ledezma-Rodriguez*, 423 F.3d at 836; *Davis*, 423 F.3d at 877. To satisfy this "prejudice" prong, the movant must show "'that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different . . . [,] a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome.'" *Rice*, 449 F.3d at 897 (again quoting *Strickland*, 466 U.S. at 694); *Davis*, 423 F.3d at 877 (same). Thus, "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005) (quoting *Strickland*, 466 U.S. at 693). Although the two prongs of the "ineffective assistance" analysis are described as sequential, courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir. 1999) (citing *Pryor v. Norris*, 103 F.3d 710 (8th Cir. 1997).

### 2. *Failure to investigate*

Miller claims that his trial counsel provided ineffective assistance by failing to investigate evidence that would have shown John Campbell likely operated the methamphetamine lab and not Miller. Specifically, Miller claims that there was certain physical evidence that more likely contained DNA or fingerprints of Campbell, rather than Miller. According to Miller, this evidence would have established that Campbell and others had access to Miller's house and were responsible for the methamphetamine lab.

In response to Miller's claim, the government argues that nothing Miller has stated shows his trial counsel acted negligently in his pretrial investigation. The government claims, first, that trial counsel reviewed the complete discovery file and met with Miller to discuss the extent of the government's case against him. Second, the government asserts that trial counsel's declaration shows that he discussed possible defenses with Miller and kept in contact with him, and with his mother. The government also notes that trial counsel's affidavit claims that Miller did not express dissatisfaction with his representation.

The Eighth Circuit Court of Appeals has explained that, "failing to . . . discover mitigating evidence may be a basis for finding counsel ineffective within the meaning of the Sixth Amendment right to counsel." *U.S. v. Vazquez-Garcia*, 211 Fed.Appx. 544, 546 (8th Cir. 2007) (quoting *Kramer v. Kemna*, 21 F.3d 305, 309 (8th Cir.1994)). However, the defendant "still needs to 'make a substantial showing that, but for counsel's failure . . ., there is a reasonable probability that the result of his trial would have been different.'" *Id.* (quoting *Kramer*, 21 F.3d at 309).

Miller argues that trial counsel failed to pursue an investigation into whether John Campbell, or others, were responsible for the methamphetamine lab. Specifically, Miller claims that he informed trial counsel of "specific articles discovered by police during the search which he believed more than likely contained physical evidence, *i.e.*, DNA and fingerprints, belonging to . . . Campbell," and would "establish[] that Campbell and others had access to his house and were responsible for the lab discovered." Doc. No. 1.

Assuming Miller requested that his trial counsel investigate the above, there are two reasons why Miller has failed to establish that there is a "reasonable probability" that the outcome of Miller's trial would have been different. *Id.*; *see also Rice*, 449 F.3d at 897 (quoting *Strickland*, 466 U.S. at 694). First, Detective Greg Van Langen, of the Estherville Police Department, testified that he made the decision not to take fingerprints due to his experience with methamphetamine labs:

> Through my training we were told that the possibility because of the atmosphere and just the overall appearance of these labs, the fingerprints were probably not going to be found. The other problem associated with these labs is that the very caustic and acidic nature, I didn't have productive gear available to me to try and do fingerprints even if there were any found.

Trial Tr. Vol.II at 154. Similarly, Todd Jones, special agent with the Iowa Division of Narcotics Enforcement stated:

> If we feel that we might have good prints on [items] such as jars or whatever, we are issued kits and dust for prints. It is a little harder to lift them in a lab environment because you have acid vapors, you have a lot of spillage in there, and I rarely get a good set of prints out of any lab.

Trial Tr. Vol.I at 73. By the time trial counsel was appointed to represent Miller on July 3, 2003, the officers had long ago performed their investigation at the methamphetamine lab. Although trial counsel could have requested that Jones examine certain items in evidence for fingerprints, Jones testified to his awareness that fingerprints may exist on items. In addition, he explained that it is rare to obtain a good set of fingerprints from methamphetamine lab evidence. Even if trial counsel had alerted Jones, another officer, or an independent investigator of the possibility of prints on certain items, the likelihood fingerprint evidence would be found was slim to none.

Even more significant, the presence of Campbell or others at the methamphetamine lab does not undermine the jury's finding that Miller also operated the methamphetamine lab. Had fingerprint evidence of another individual been found at the lab, it may have led to an investigation of other suspects. However, the fact that Campbell or others were at the lab, or even involved with the operations of the lab, does not show that Miller was not involved. In fact, the jury heard evidence from the government's witnesses, through direct and cross examinations, that the lab was easily accessible by the public—the lab was in a shed that only had a rubber tarp sealing the entrance. Trial Tr. Vol.I at 77. The trial evidence was consistent with the possibility that multiple people could have gained entry to the shed to operate the lab or for some other reason. Therefore, evidence that one particular individual, Campbell, was present in the lab would not undermine the jury's

finding that Miller operated the lab. *See Rice*, 449 F.3d at 897 (To satisfy the "prejudice" prong, the movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . [,] a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome." (citations omitted).

### 3.    *Failure to interview witnesses*

Miller claims that his trial counsel neglected to interview potential defense witnesses to determine whether they possessed exculpatory information. These alleged witnesses are Dennis Hinrichs, Tammy Meyeraan, and Leigh Johnson.

### a.    *Dennis Hinrichs*

Miller claims that his trial counsel improperly failed to interview Dennis Hinrichs. According to Miller, Hinrichs was his employer and would have "established that [he] was recently out of town working in the state of Georgia immediately before the inactive methamphetamine lab was discovered at his Estherville residence." Doc. No. 1. Miller also claims that the testimony would have corroborated his claims that he was out of town and that the lab was not his. Miller asserts that Hinrichs would have provided employment records that "conclusively established Miller's whereabouts before his arrest." *Id.*

The government claims that trial counsel's affidavit shows that he *did* interview Dennis Hinrichs and that the interview failed to establish the existence of employment records or provide a factual basis for Miller's claim that he was out of state prior to his arrest. The government also contends that trial counsel made the decision not to further investigate Miller's employment status prior to his arrest after talking to Hinrichs.

Trial counsel's affidavit states that:

> One of the witnesses interviewed by my office was Mr. Dennis Hinrichs, Mr. Miller's employer. That interview failed to

establish the existence of any employment records or
verification of location for Mr. Miller in Georgia as claimed
in this action. The interview of Mr. Hinrichs failed to produce
any information material to Miller's defense.

Docket no. 6-2. Miller claims that trial counsel failed to interview Hinrichs, while trial
counsel claims that he did interview Hinrichs. Miller claims that his disagreement with
trial counsel is "the 'classic battle of the affidavits.'" Docket no. 9. Although such a
battle might exist had Hinrichs provided an affidavit stating that he was never contacted
by trial counsel's office, he did not provide an affidavit. Instead, Miller provided the court
only with an email—allegedly from Dennis Hinrichs—that attests to the money Miller spent
on motel bills in Georgia. The most recent figure in the email was from May 12, 2001,
for the amount of $330.75. Because Miller was arrested on May 30, 2001, Trial Tr. Vol.I
at 92, the email does not provide support for Miller's claim that he was in Georgia
immediately before his arrest. In the absence of an affidavit from Hinrichs, trial counsel
is best situated to inform the court of who he contacted. Miller has failed to show that trial
counsel failed to contact Hinrichs and, more importantly, he has failed to show that
Hinrichs would have provided testimony or other evidence that undermines the court's
confidence in Miller's verdict. *See Rice*, 449 F.3d at 897 (citations omitted).

### b.    *Tammy Meyeraan and Leigh Johnson*

Miller argues that his trial counsel also should have interviewed Tammy Meyeraan
and Leigh Johnson. Miller claims that Meyeraan would have testified that Miller had not
been living in Estherville for a three month period before his arrest and corroborated the
testimony of both Miller and Hinrichs—that Miller regularly worked out of town.
According to Miller, Meyeraan would have testified that, on several occasions, she saw
several people coming and going from Miller's residence while Miller was away working.

Miller argues that this testimony could have provided a reasonable explanation for the presence of the lab, which is that it could have belonged to someone else.

Miller claims that Johnson could have testified about a conversation she had with Bob Juchem on the evening before Miller's arrest. According to Miller, Juchem called Johnson to have Miller removed from his home because he was acting erratically. Miller argues that his presence at Juchem's house, along with his recent arrival to town, precludes the possibility that he had operated the methamphetamine lab—Miller claims that the trial produced evidence that the lab was used "very recently[4]." Miller claims that he would not have been able to make methamphetamine at the lab during that time frame, especially considering he was heavily under the influence of drugs and in a disturbed mental state. Miller claims that trial counsel's failure to pursue this argument as a line of defense was inexcusable and amounts to ineffective assistance of counsel.

Concerning Meyeraan and Johnson, the government claims that these two witnesses provide no new information that would support Miller's claim that he was not responsible for the lab found on his property.

Even assuming Meyeraan and Johnson's representations to the court are true, they do not show Miller was prejudiced by trial counsel's alleged decision not to interview them. First, Miller claims that Meyeraan, his son's mother, could have testified that Miller was not living in Estherville for the three month period preceding his arrest. In her affidavit, Meyeraan states that she knew "that on the date that [Miller] was supposedly

_____

[4] Dickinson County Deputy Sheriff Donald Gude testified that he could not determine the exact time that the lab was last used but stated that, "the filters [used to make methamphetamine] were still wet so it couldn't have been too awful long before [May 30, 2001]." Trial Tr. Vol.I at 126. When asked if he could make an estimate of when the filters were used, Gude stated "I could not do that [give an estimate], even if I was asked to." *Id.* at 126-127.

14

living in the house that was raided he was not there." Docket no. 1-3. She claims that after his last work trip, prior to May 30, 2001, that:

> [H]e had said there was no electric, and I believe no water, and no gas and that it would not be appropriate to have [Miller and Meyeraan's son] there, and he wanted to stay at my house for a couple days. I had agreed to do so. He brought clothes and things in bags when he got to my house he spent a full day there and was real uneasy when neighbor showed up. He made statement of wanting to take kids fishing and [Miller] took it like he was taking them alone, which would never happen. I was always with my kids. [Miller] made big scene and the gentleman left to go home. That afternoon he left with some of his friends, not sure who picked him up. Then he returned about *three days later* in a uproar cause I had company there. I told him that he had to get his things and leave. This was my house and he didn't pay my bills and was not going to tell me who I could and couldn't have in home. I told his friend to help him get his stuff out. His friend Bob helped him take out his things. Thomas then started acting real weird like he needed to get help. I called his mother Sandy in Minnesota and told her someone needed to come help him and I was afraid for me and my family. He was sending messages and calling me making threats. It was the usual thing for bi-polar and some schizophrenics to do . . . . I was told to lock the doors and if he came to call the police on him . . . most of the time I stayed at friends house so I wouldn't be alone. The next thing I knew he was in the mental health unit . . . .

Docket no. 1-3 (emphasis added). Regardless of whether Meyeraan believed Miller was living in his residence, she admits that he left her house for a three day period prior to the day he was arrested, and she does not account for his whereabouts during those days. Her description of events does not contradict the evidence that he used the methamphetamine lab, or even that he used the methamphetamine lab not "too awful long before" May 30,

15

2001. *See* Trial Tr. Vol.I at 126. The description does, however, contradict Miller's claim that he "had just returned home from working immediately before the inactive methamphetamine lab was discovered at [his] home." Docket no. 5.

Miller also contends that Meyeraan's testimony would have been useful to establish that people aside from Miller were coming and going on Miller's property when he was away. As is stated above, the mere presence of other people on Miller's property is not inconsistent with the evidence presented at trial. Officers investigating the methamphetamine lab found that it was only secured from the public by a tarp hanging in the door of the shed. Trial Tr. Vol.I at 77. Trial counsel's theory of defense was that others could have entered the lab, and he was able to present evidence of this possibility through his cross examinations. However, the jury apparently did not accept the theory, based on evidence presented at trial, which included a statement from Miller that he had been sleeping for two or three days on his couch in anhydrous ammonia, Trial Tr. Vol.I at 94, his statement that there was a methamphetamine lab at his residence and that is where the anhydrous ammonia came from, *Id.* at 95, and the fact that he had been arrested only two blocks from his house. *Id* at 98. The presence of other people at the methamphetamine lab, when he was in town or out of town, would not undermine the evidence presented that supported a finding that Miller operated the lab.

Johnson's affidavit is equally unhelpful to Miller's claim that he could not have operated the methamphetamine lab close to his arrest, or at all. Johnson states the following concerning Miller's location prior to his arrest:

> In May of 2001, Bob Juchem Jr. had called me to see how to get [Miller] out of his house, cause [Miller] was scaring Bob and his family. . . . Then a couple days later I placed a call to a friend of ours . . . to see if she had heard anything from

> [Miller]. [She] told me she had seen the police take [Miller]
> by ambulance in front of her house.

Docket no. 1-4. Johnson does not identify the day in May when Miller was allegedly at Juchem's house, but Miller claims, in his affidavit, that Johnson received the call on May 29, 2001. Even if Miller was not at his residence the night before he was arrested, and was already acting erratically, the evidence presented at trial was that the methamphetamine lab was used multiple times and that the last cook "couldn't have been too awful long before [May 30, 2001]." Trial Tr. Vol. I at 126. Johnson's affidavit fails to preclude the possibility that Miller used the lab during the three day period identified by Meyeraan. Even if Johnson's affidavit refers to May 29, 2001, her testimony at trial would not have meaningfully aided Miller in his defense.

Even if trial counsel would have interviewed both Meyeraan and Johnson, or even had them testify at trial, their account of Miller's whereabouts leading up to his arrest contains a significant gap in time. Meyeraan claims that Miller was living with her for a while preceding his arrest, but also that he "left with some of his friends, not sure who picked him up. Then he returned about three days later in an uproar cause I had company there." Docket no. 1-3. Johnson only accounts for Miller's whereabouts on one day, and only based on Juchem's claim that Miller was at Juchem's house. Although Miller believes Meyeraan and Johnson should have been interviewed, he "has failed to establish prejudice, that is, a reasonable probability that had his trial counsel interviewed the []witnesses prior to trial, the outcome of his trial would have been different." *U.S. v. Davis*, 406 F.3d 505, 510 (8th Cir. 2005) (citing *Payne v. United States*, 78 F.3d 343, 348 (8th Cir.1996) (rejecting ineffective assistance claim where, even if counsel's performance was deficient for failing to interview or investigate witnesses, defendant failed to establish that interviewing witnesses would have changed the outcome)).

## 4.    *Failure to challenge post arrest statements*

Miller claims that trial counsel was ineffective for failing to challenge statements Miller made following his May 30, 2001, arrest.  Miller claims that these statements were used both as a basis for the search of his residence and against him at trial.  According to Miller, the statements could have been challenged as a possible *Miranda* violation[5] and be otherwise inadmissible because of his mental state at the time.  Miller does not mention these statements, or any discussions he may have had with trial counsel concerning whether or not to challenge the use or admissibility of these statements, in his affidavit. *See* docket no. 5.

The government claims that Miller's post arrest statements were voluntary. Although the statements indicated that a methamphetamine lab could be found on Miller's property, the government asserts that the use of the statements was not prejudicial to Miller because he did not accept responsibility for the lab.  The government also refers to trial counsel's affidavit, which allegedly shows that he consulted with Miller and that the decision was made not to pursue suppression of the statements.

Miller does not claim in his affidavit that his trial counsel's decision not to pursue suppression of the statements was anything other than a strategic choice after investigation of the issue and consultation with Miller.  *See Rice*, 449 F.3d at 897 ("'[s]trategic choice[] made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable'") (citations omitted).   The record's only evidence on the decision not to pursue suppression of the statements is from trial counsel's affidavit, where

_____

[5]   *Miranda v. Arizona*, 384 U.S. 436 (1966).

18

he states:

> The circumstances surrounding Mr. Miller's initial contact with law enforcement officers in Estherville, Iowa, on the morning of May 30, 2001, were examined with attention to possible suppression issues. After consultation with Mr. Miller, it was decided not to pursue suppression of any statements made by Tom Miller at the hospital or challenge the search warrant obtained by Estherville Police.

Docket no. 6-2. Trial counsel states that he examined, with attention, the possibility of a suppression motion, consulted with Miller about pursuing the suppression of the statements, and decided against pursuing suppression. Trial counsel's account of the decision not to pursue suppression of the statements is uncontested, and Miller has not shown in any other way that trial counsel's performance was deficient[6]. Since Miller did

---

[6] Even if the court had found that his trial counsel's performance was deficient, Miller does not provide evidence that he was prejudiced by his trial counsel's failure to pursue a suppression claim. The United States Supreme Court discussed the relevant contours of *Miranda* in *Colorado v. Connelly*, 479 U.S. 157 (1986). In *Connelly*, the defendant approached a police officer and stated "that he had murdered someone and wanted to talk about it." *Connelly*, 479 U.S. at 160. The officer immediately gave the defendant his *Miranda* warnings, but the defendant continued to talk about the murder. *See id.* The Court noted:

> The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. *See United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977); *Miranda, supra*, 384 U.S., at 460, 86 S.Ct., at 1620. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police

(continued...)

not show "deficient performance" by counsel, the court need proceed no further in its analysis of the "ineffective assistance" claim related to the suppression of his post arrest statements. *See Walker*, 324 F.3d at 1040.

### C. *Motion for Evidentiary Hearing*

Miller asks the court to hold an evidentiary hearing on his Motion. *See* docket no. 10. "Unless the motion and the files and records of the case conclusively show that the

---

[6](...continued)

> overreaching, not on "free choice" in any broader sense of the word. *See Moran v. Burbine*, 475 U.S., at 421, 106 S.Ct., at 1141 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . . [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *Fare v. Michael C.*, 442 U.S. 707, 726-727, 99 S.Ct. 2560, 2572-2573, 61 L.Ed.2d 197 (1979) (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit . . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*").

*Id.* at 170; *see also Gingras v. Weber*, 543 F.3d 1001, 1003 (8th Cir. 2008) (citing *Connelly* and finding nothing "to suggest that [the petitioner] was subjected to the kind of coercive police activity that is necessary to establish that a confession was involuntary."). Although Miller has several reasons why he believes the statements should be suppressed, none of them relate to the reasons to suppress statements under *Miranda* and its progeny. Even if Miller incriminated himself due to psychological pressures, whether part of a mental disorder or drug induced, "the Fifth Amendment privilege is not concerned 'with . . . psychological pressures to confess emanating from sources other than official coercion.'" *Connelly*, 479 U.S. at 170 (citing *Oregon*, 470 U.S. at 305).

prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 18 U.S.C. § 2255. For the above reasons, the court finds that a hearing would not assist the court in this case, as the record conclusively shows that the prisoner is entitled to no relief. *See id.* Therefore, the court denies Miller's motion for an evidentiary hearing (docket no. 10).

## III. *CERTIFICATE OF APPEALABILITY*

Denial of Miller's § 2255 Motion raises the question of whether or not he should be issued a certificate of appealability for his claim. The requirement of a certificate of appealability is set out in 28 U.S.C. § 2253(c)(1), which provides, in pertinent part, as follows: "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from: (B) the final order in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1)(B); *accord* FED. R. APP. P. 22(b). To obtain a certificate of appealability on claims for § 2255 relief, a defendant must make "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000); *Mills v. Norris*, 187 F.3d 881, 882 n.1 (8th Cir. 1999); *Carter v. Hopkins*, 151 F.3d 872, 873-74 (8th Cir. 1998); *Ramsey v. Bowersox*, 149 F.3d 749 (8th Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied*, 525 U.S. 834 (1998). "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox*, 133 F.3d at 569. Moreover, the United States Supreme Court reiterated in *Miller-El* that "'[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. Ct. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The court finds that Miller has not made a substantial showing of the denial of a constitutional right on his § 2255 claim. *See* 28 U.S.C. § 2253(c)(2). Specifically, there is no showing that reasonable jurists would find this court's assessment of Miller's claim debatable or wrong, *Miller-El*, 537 U.S. at 338; *Cox*, 133 F.3d at 569, or that any court would resolve those issues differently. *Cox*, 133 F.3d at 569. Therefore, Miller does not make the requisite showing to satisfy § 2253(c) on his claim for relief, and no certificate of appealability will issue in this case. *See* 28 U.S.C. § 2253(c)(2); FED. R. APP. P. 22(b).

## IV. CONCLUSION

THEREFORE, petitioner Thomas Lee Miller's Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 (**docket no. 1**) is **denied** in its entirety. Miller's Motion for Evidentiary Hearing (**docket no. 10**) is also **denied**. This matter is **dismissed in its entirety**, and this court will issue no certificate of appealability for any claim or contention in this case.

**IT IS SO ORDERED.**

**DATED** this 30th day of June, 2009.

Mark W. Bennett
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA